

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HSBC BANK USA, as Trustee, | )<br>)<br>) |
| Appellant and Cross-Appellee, | )<br>) |
| v. | ) No. 07 C 1372<br>)<br>) Judge John W. Darrah |
| UNITED AIRLINES, INC., Reorganized Debtor, | )<br>)<br>) |
| Appellee and Cross-Appellant. | ) |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on cross-appeals of the October 5, 2006 judgment of the bankruptcy court by HSBC Bank USA ("HSBC") and United Air Lines, Inc. ("United"). For the following reasons, the decision of the bankruptcy court is affirmed.

## BACKGROUND

In 1973, United entered into a lease with the City and County of San Francisco ("the MOC Lease") for an approximately 128-acre area of land and improvements known as the Maintenance Operations Center ("the MOC") at San Francisco International Airport ("SFO"). The MOC Lease had an initial term of twenty years. United had the option to extend the lease by ten years to 2003 and a further option for an additional ten-year extension to 2013.

In 1997, United entered into complex funding transactions to build and improve certain premises at SFO. The California Statewide Communities Development Authority ("the Authority") issued nearly $145 million in public bonds ("the Bonds"), the proceeds of which were used by United to improve property outside the MOC. To secure its promise to repay the

Bonds, United entered into a sublease with the Authority, carving out and conveying 20.75 acres of property and buildings from the MOC ("the Property"). The property was then leased back to United through a sub-sublease ("the Sublease"). During the 1997 transaction, HSBC's predecessor, as Trustee on the Bonds, perfected a security interest in United's leasehold interest in the Property.

The Property is divided into components: (1) a building ("Building 47"), consisting of an aircraft hangar and a five-story office building; (2) an apron to the hangar; and (3) an adjoining piece of paved fenced-in land capable of accommodating several aircraft ("Plot 52"). United used the hangar to perform maintenance. The office building is used for administrative space and storage. United uses Plot 52 for overnight parking of aircraft and maintenance.

On December 9, 2002, United filed for bankruptcy. On March 21, 2003, United filed an adversary proceeding to recharacterize the Sublease as a secured financing. The bankruptcy court and, on appeal, the Seventh Circuit held that the Sublease was actually a secured financing agreement; and the Seventh Circuit remanded the matter to the bankruptcy court. *In re UAL Corp.*, 307 B.R. 618 (Bankr. N.D. Ill. 2004) *rev'd* 317 B.R. 335 (N.D. Ill. 2004) *rev'd* 416 F.3d 609 (7th Cir. 2005), *cert. denied* 547 U.S. 1003 (2006).

Under United's Plan of Reorganization, the value of HSBC's security interest, United's leasehold in the Property, would be paid in full to HSBC; and HSBC would have an unsecured claim for the balance of United's obligations under the Bonds in excess of the value of the Sublease. HSBC commenced an adversary proceeding to determine the nature, scope and value of its security interest. United and HSBC stipulated as to the geographic scope of the Property

and stipulated that HSBC's security interest was valid and perfected. The trial on HSBC's complaint took place on April 24-25, 2006. On October 5, 2006, the bankruptcy court entered judgment, valuing HSBC's collateral at $27,247,632. Both HSBC and United have appealed that judgment.

## LEGAL STANDARD

A bankruptcy court's conclusions of law are reviewed *de novo*. *See Meyer v. Rigolon*, 30 F.3d 1375, 1378 (7th Cir. 1994). The Court reviews the bankruptcy court's factual findings for clear error. *See Hoseman v. Weinschneider*, 322 F.3d 468, 473 (7th Cir. 2003). A finding of fact is clearly erroneous if, after reviewing the evidence, "the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985).

## ANALYSIS

HSBC first argues the bankruptcy court erred by misapplying the standard for valuing property that the debtor proposes to retain, rather than sell or surrender, established by the Supreme Court in *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997) (*Rash*). Specifically, HSBC claims the bankruptcy court erred by not taking into account United's commitment to pay $142 million to assume the Sublease in the event that the Sublease was found to be a true lease rather than a secured financing.[1] United agrees that *Rash* supplies the correct standard but disputes HSBC's interpretation of that standard.

---

[1] A petition for certiorari had been filed with the United States Supreme Court, challenging the Seventh Circuit ruling that the Sublease was a secured financing agreement.

3

In *Rash*, the Supreme Court held that the value of a secured claim under Section 506(a) of the Bankruptcy Code is "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Rash*, 520 U.S. at 960. The Court termed this measure the "replacement value" standard." *Rash*, 520 U.S. at 955. The Seventh Circuit has characterized the inquiry under § 506(a) as a search for the "market value" of the collateral. *See In re Wright*, 492 F.3d 829, 830 (7th Cir. 2007).

HSBC argues that United's commitment to pay $142 million to retain control of the Property in the event that the Sublease was found to be a true lease is highly relevant to the determination of the replacement value and controlling evidence of the price a willing buyer would pay. United argues that the question is not what United might theoretically be willing to pay, but what someone in United's situation would have to pay to replace the Property. In other words, any value of the Property above and beyond its value to a similar airline (value specific only to United) is not relevant to the § 506(a) inquiry under *Rash*.

The replacement-valuation method prescribed by *Rash* "does not include any consideration of factors that are particularly unique to the debtor." *In re Arden Properties, Inc.*, 248 B.R. 164, 172 (Bankr. D.Ariz. 2000) (*Arden*). In *Arden*, the court addressed the question of the value of a polluted property. *Arden*, 248 B.R. at 171. The court held that an exemption that the debtor had negotiated with the EPA, which would not apply to any other potential owner of the property, was not to be considered in determining the value of the property because it was unique to the debtor. *Arden*, 248 B.R. at 172. The Seventh Circuit upheld a ruling based on the same interpretation of § 506(a) in *In re Wabash Valley Power Ass'n Inc*, 72 F.3d 1305, 1312 (7th Cir. 1996) (*Wabash*). There, the question was the valuation of several power plants that

4

were uniquely designed to provide power to the debtor. *Wabash*, 72 F.3d at 1312. For the purposes of § 506(a), however, their unique value to the debtor was not relevant; rather, it was their market value as a going-concern that the court determined to be the correct value. *Wabash*, 72 F.3d at 1312. Though *Wabash* was decided before *Rash*, the cases are not in conflict. Therefore, considerations that are unique to United, such as the Property's central role in United's maintenance operations and its Pacific and Asian routes, are not relevant to determining the "replacement value" under *Rash*.

In applying *Rash*, the bankruptcy court accepted HSBC's suggestion that Superbay, a similar hangar facility at SFO, should be used as "like property" in calculating the value of the Property. The court found that Superbay provided the best indication of what United or a similarly situated buyer would have to pay for a similar lease for land like the Property. The court reasoned that: the facilities at the Property and at Superbay are similar; the leases for the two properties were negotiated by parties of similar sophistication; and, most importantly, according to the bankruptcy court, both have the advantage of being located at SFO. This Court finds no error in the bankruptcy court's application of *Rash*.

HSBC next objects to the specific method by which the bankruptcy court calculated the value of the Property based on Superbay. The court divided the Property into four areas: paved area, hangar space, office space and storage space. The court then calculated a per-square-foot value for each area, using rates from the MOC lease and the lease for Superbay. HSBC does not object to the values assigned to the office space and storage space. HSBC does object to the court's valuation of the paved space and the hangar space.

The bankruptcy court calculated the value of paved area by reference to the MOC Lease and found it to be $1.50/sq. ft. annually. The court calculated the value of hangar space per square-foot by reference to the Superbay lease. The court took the total value of the Superbay lease and subtracted out the amount that was attributable to paved area (using the $1.50/sq. ft. value) to determine the value of the Superbay hangar space. The court then divided this value by the area of the hangar space in square-feet to determine the value of hangar space per square-foot. By this method, the court determined that hangar space should be valued at $9.94/sq. ft. annually. Using these two rates, $1.50 for paved area and $9.94 for hangar space, and the agreed rates for office space and storage space, the court calculated the annual value of the Property to be roughly $4.7 million.

HSBC argues that this method assigns too high a value to the paved space. HSBC points out that the actual lease for Superbay sets hangar space at $20.01 per square-foot with no cost for the surrounding paved space. HSBC also points out that United's expert admitted that similar hangar facilities at SFO cost at least $20.00 per square-foot. United replies that it is actually the paved space at Superbay that is of value, rather than the hangar space; and the Superbay lease takes the value of the paved space into account when setting the hangar space value at $20.01 per square-foot.

"Valuation is a question of fact, and can be overturned on appeal only if clearly erroneous." *Matter of Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1232 (7th Cir. 1990). Here, the bankruptcy court calculated the value of the Property with reference to other leases at SFO covering the same or similar property. This Court finds no clear error with the bankruptcy court's methods.

The bankruptcy court discounted the value of the Sublease in future years to obtain the present value as of January 20, 2006, the date of United's plan's confirmation hearing. HSBC argues that the bankruptcy court erred in determining the appropriate discount rate. Under the appropriate discount rate, HSBC would be indifferent between one lump-sum payment and a stream of payments through 2013. The discount rate must take into consideration the risk that the renter of the property would default; a higher risk of default means that a lower lump-sum payment is required to make HSBC indifferent between the two. Here, the bankruptcy court found that the only party that would rent the Property at full value was a major airline that would be able to make full use of the hangar space. Equating the risk of default on the lease to the risk of a major airline defaulting on other obligations, the bankruptcy court determined that the industry-wide cost of capital for major airlines was a suitable measure of the risk inherent in the lease. The bankruptcy court found that rate to be 13.04 percent. The bankruptcy court's factual determination on this issue does not present clear error in this case.

HSBC next argues that the bankruptcy court erred in cutting off valuation of United's lease payment for the property in 2013 rather than 2023. HSBC argues that United stipulated to a recognized security interest in United's leasehold interest as it then existed, which included an option to extend the Sublease through 2023. The bankruptcy court held that, as a matter of law, HSBC's collateral does not include the option to extend the MOC lease from 2013 to 2023 because United acquired the option after its bankruptcy filing. Section 552(a) of the Bankruptcy Code, with one exception that does not apply here, provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." *See also*

*Wabash*, 73 F.3d at 1322 (post-petition acquired collateral exempted under § 552(a) cannot be part of a § 506(a) violation). Therefore, the bankruptcy court correctly concluded that the value of the Sublease should take into consideration the period through 2013, but no later.

Finally, HSBC argues that the bankruptcy court erred by holding that confirmation of United's plan barred HSBC from pursuing a claim for adequate protection. United argues that HSBC waived this issue because it was not raised until judgment was entered, following the trial in the bankruptcy court. The bankruptcy court rejected this argument, allowing HSBC to argue that it was entitled to adequate protection on a Rule 59(e) motion to alter or amend the judgment. As the bankruptcy court rightly pointed out, the principle that arguments raised for the first time only after the judgment should not be considered in motions to alter or amend the judgment is not an absolute limitation on the court. *See Boulevard Bank N.A. v. Phillips Med. Systems Int'l B.V.*, 15 F.3d 1410, 1426 (7th Cir. 1996). Thus, it was within the bankruptcy court's discretion to address the merits of HSBC's adequate protection claim.

Addressing HSBC's claim on its merits, the bankruptcy court held that "[s]ince plan confirmation terminated the statutory right that HSBC had to an award of adequate protection, HSBC could only be entitled to adequate protection if the plan itself so provided." The bankruptcy court determined that the plan failed to provide for adequate protection payment for HSBC's claim. The court cited provisions of the plan that require United to pay the extent of HSBC's security interest in United's SFO lease in cash and to pay any amounts owed by United exceeding that security interest pro rata with other unsecured claims. The bankruptcy court held that this treatment of HSBC's claims was exhaustive. Thus, under the plan, HSBC could receive

no award of adequate protection. A bankruptcy court's interpretation of a confirmed plan shall not be overturned unless the record clearly shows an abuse of discretion. *In re Weber*, 25 F.3d 413, 416 (7th Cir. 1994). Here, the record shows no abuse of discretion by the bankruptcy court.

United's single point on cross appeal is its contention that the bankruptcy court erred by failing to subtract "contract rent" from "market rent" in valuing the leasehold. United argues that the value of a leasehold is the difference between the fair market value of that leasehold ("market rent") and payments due under the lease ("contract rent"). United argues that the bankruptcy court calculated the market rent for the property, a present-value worth of roughly $27 million through 2013, but failed to subtract the present value of the contract rent, which United calculates to be roughly $7.5 million. United bases this calculation on the rent United pays for the 20.75 acres that make up the Property under the MOC Lease.

The bankruptcy court rejected this argument, observing that this was not a standard lease and that, therefore, the standard method of calculating the value of the leasehold did not apply. The bankruptcy court noted that while United gave HSBC its right to possess a portion of the MOC leasehold, United retained all of its payment obligations under the MOC Lease. Therefore, HSBC had the right to use the Property without paying rent, subject to United's right to use the property under the leaseback. HSBC's security interest is, therefore, the full "market rent," undiminished by the "contract rent" that United must pay under the MOC Lease. Thus, the bankruptcy court's application of the law was correct on this issue.

## CONCLUSION

Based on the foregoing, the judgment of the bankruptcy court is affirmed.

Dated: March 25, 2008

JOHN W. DARRAH
United States District Court Judge